Filed 9/30/20  In re Rose G. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROSE G., a Person Coming Under the Juvenile Court Law. | B303899 |
| | (Los Angeles County Super. Ct. No. 18CCJP04092A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent.<br><br>v.<br><br>CRISTINA L.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Nichelle Blackwell, Juvenile Court Referee.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Aileen Wong, Deputy County Counsel for Plaintiff and Respondent.

_____

Cristina L. (mother) appeals from an order denying her petition for modification of juvenile court order pursuant to Welfare and Institutions Code section 388.[1]  Mother filed her section 388 petition prior to the section 366.26 hearing terminating her parental rights to Rose G.L. (born May 2018).  Mother argues that the juvenile court abused its discretion in denying her petition because mother, who was diagnosed with mild mental retardation, had full time residential support to assist her with her living needs and caring for her child.  We find that the juvenile court did not abuse its discretion in determining that mother had failed to show changed circumstances or that the requested change of order would be in Rose's best interests.  Therefore, we affirm the order.

**FACTUAL AND PROCEDURAL HISTORY**

Rose's father has been identified as Carlos G. (father), who was not living with mother and Rose at the time of the initial referral.[2]

In June 2018, the Los Angeles County Department of Children and Family Services (DCFS) received a referral that mother was not properly caring for one-month-old Rose.  Mother, a heavy sleeper, was co-sleeping with the baby, Rose, who was

_____

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Father is not a party to this appeal.

2

constantly crying.  Mother did not regularly bathe or change the baby's diaper and as a result Rose had a rash.

**Prior child welfare history**

Mother had been a dependent of the juvenile court between 2002 and 2004, when the juvenile court ordered a legal guardianship for her.  In 2013, mother was declared a non-minor dependent until 2014, when she reached the age of 21.

In April 2013 a referral alleged general neglect by mother of her daughter Aaliyah, including concern regarding mother's ability to care for Aaliyah.  The home and the baby were dirty and mother would yell at the child.  The referral was closed as substantiated. The child was detained in August 2013 with family reunification services.

In August 2013, there were allegations of mother's general neglect of Aaliyah.  A juvenile petition was filed on behalf of Aaliyah, and the court sustained allegations of neglect.  In January 2014, the juvenile court made a home-of-parent-mother order with family maintenance services for the parents.  Later, the juvenile court terminated jurisdiction with a family law order granting the parents joint legal and physical custody of Aaliyah with mother's residence to be primary.

In January 2016, there were again allegations of general neglect as to Aaliyah by both parents.  Mother was reported to be developmentally delayed with mild mental retardation.  Regional center staff visited the home and found Aaliyah to be sick and hungry, and no food in the home.  Mother was asleep when the staff arrived around 12:30 p.m. and the child was unsupervised, and dehydrated.  Mother told the regional staff that she used crystal methamphetamine for weight loss.  The allegations were

substantiated and Aaliyah was detained in February 2016 with family reunification services.

Mother was ordered to comply with weekly drug testing. She did not comply with drug testing and did not enroll in a drug rehabilitation program. She attended only three parenting classes. Eventually a family law order was issued, awarding Aaliyah's father sole legal and physical custody.

**Initial investigation**

The June 25, 2018 referral to DCFS regarding Rose came from a caller who lived in the same home as mother and Rose. The caller was concerned about leaving the baby with mother, who the caller believed might have a cognitive disability. The caller reported that mother was neglectful and not taking the child to the pediatrician for care. Mother was co-sleeping with the baby, did not bathe the baby, and the baby was constantly crying.

The social worker who went to the family home immediately noted that mother had some developmental delay. Mother spoke warily with the social worker, but acknowledged that though she had mild mental retardation, she could care for her baby. Mother was a client of the Lanterman Regional Center, although it had been over eight months since she had contact with the center.

Mother admitted to sharing a bed with Rose, and that she is a heavy sleeper. She liked having the baby in bed with her, laughing while noting "She can cry and cry and I won't wake up!" Mother showed the social worker that Rose slept near two large pillows, which separated her from piles of clothes and other belongings stored on the bed. The social worker advised mother to get some sort of crib or bassinet for the baby. Mother "looked

annoyed" and said she would do that.  When the social worker offered mother assistance, mother replied "I don't want any help from you people!  I don't need any help."

Mother claimed to have taken Rose for her first doctor's appointment three days after they left the hospital.  However, they had not returned, and mother did not know the doctor's last name.  Mother also did not know the location of the doctor's office.  Mother was vague and unwilling to provide further information.

Mother provided father's first name and claimed that they intended to move in together soon.  Mother did not want to provide father's address, though she said he lived with friends.  Mother said father would be very angry if he found out that she had spoken with the social worker.  For this reason mother insisted that the social worker not speak to father.

Mother refused the social worker's offer of bus tokens, again stating "I don't want any help from you."  Mother initially denied drug use, then later admitted to using crystal methamphetamine, stating that she was "young and dumb," and that she no longer uses the drug.  She denied participating in rehabilitation.  Mother first denied having any other children but then admitted having an older child who lived with her paternal grandparents.  When the social worker asked why, mother responded, "I don't want to talk about that.  I don't have to talk about that."

The social worker formed the opinion that mother could benefit from assistance, despite mother's refusal.  The social worker advised mother to take the child to a doctor, and mother responded that it was none of the social worker's business.  Mother appeared distrustful and resistant to assistance.

Wendy G., mother's roommate, was concerned about Rose because mother would only feed her once or twice a day, and the formula was often sour due to sitting out for long periods of time. Mother also never washed the baby bottles, so Wendy would wash them when she returned from work. Neither mother nor the baby would bathe, and both were dirty and had a foul odor that permeated the room. Wendy also had grave concerns about the sleeping arrangements. Wendy said she would try to wake mother when Rose cried, but often mother would not respond.

Thinking that mother might be a flight risk, DCFS took Rose into protective custody and detained her in a foster home with Jorge and Sandra E.

**Section 300 petition and detention**

On June 28, 2018, DCFS filed a petition on behalf of Rose pursuant to section 300. Under section 300, subdivision (b), the petition alleged that mother had cognitive disabilities, including a diagnosis of mental retardation, which rendered her unable to care for the child. The mother's disabilities interfered with her ability to provide regular care and supervision to the child. Under section 300 subdivision (j), the petition alleged that Rose's sibling was a prior dependent of the court due to mother's cognitive needs, and that mother's inability to provide parental care and supervision placed the child at risk of serious harm and damage.

At the June 29, 2018 detention hearing, the juvenile court ordered Rose detained from parental custody. Mother was permitted six hours of monitored visitation per week. Mother was to be given referrals for a 26-week parenting class and was to comply with regional center services. The matter was set for an adjudication hearing.

**Adjudication/disposition report and last minute reports**

On August 6, 2018, DCFS filed a jurisdiction/disposition report and Rose remained placed with her foster family.

In a July 2018 interview, mother admitted to having a diagnosis of mild mental retardation. However, she stated that it was not right to take her daughter for this reason. Mother acknowledged that she received "WIC" (a federal supplemental nutrition program) to provide formula for Rose; that she slept in her "couch bed" with Rose; and claimed that the allegations against her regarding Aaliyah were false. Mother admitted to using crystal meth in the past but had not used in two years, after having overdosed and being hospitalized.

Mother's landlord wanted mother to leave the home by the end of July. Mother initially planned to move in with father, but later said she did not know where she would live. Mother did not want the social worker to speak with father, as father would be upset that the minor was not in mother's care.

Wendy G. expressed concern about mother's ability to sleep through the baby's incessant crying and mother's failure to bathe Rose. Wendy would bathe the baby once a week, because mother could not bathe the baby. Wendy had never met father, but reported that mother told her that once father had hit mother and had been arrested. Mother told Wendy that father would take mother's money. Since mother had been staying with Wendy, mother had not washed her clothes, so Wendy gave mother clothes.

Mother's previous regional center case manager reported that mother had refused services and did not attend parenting classes. When DCFS requested assistance in activating mother's

case, the case manager had mother's charts taken out of storage and the case re-opened.

On July 18, 2018, mother reported that she had not had any visits with Rose. Mother's visits were scheduled for Mondays, Wednesdays, and Fridays from 11:00 a.m. to 2:00 p.m. Mother did not appear for her scheduled visits on July 24, 27, or 30, 2018. On July 25, 2018, mother arrived for the visit 50 minutes late. On August 1, 2018, mother arrived on time for the visit, stating that she was having difficulty obtaining money for transportation.

In a last-minute information for the court, DCFS reported that the parents had a visit on September 21, 2018. Though the visit was scheduled to be three hours, father left after an hour. The baby was fussy and father threw her in the air. Mother told father not to toss the child in the air, and father became aggressive towards mother. Upset, father left shortly thereafter. On September 26, 2018, the parents were scheduled for another visit. Mother reported to the caregiver that father was hungover due to drinking the previous night, therefore he was unable to visit. Mother was present for three hours, and appeared to be bonding with the baby and soothing her. The caregiver reported her opinion that it was not a good idea for the parents to visit together. Mother had expressed to the caregiver that she did not want Rose released to father because father had been abusive towards her. Mother added that the paternal family was abusive towards her, but provided no details.

A multidisciplinary assessment team summary report was provided to the court. Father had been interviewed on September 13, 2018, when he stated that mother had problems with self-care such as bathing, brushing her teeth, and nutrition.

Mother's mental and emotional state also put Rose at risk of general neglect and deprivation of her basic needs. Mother denied being neglectful and did not understand why Rose was being detained. Rose had adjusted well to living with Sandra and Jorge and seemed to be developing a strong attachment to them.

In a last-minute information for the court dated November 6, 2018, DCFS reported that mother failed to appear for her scheduled regional center intake on October 8 and 9, 2018, claiming that she had overslept. On October 26, 2018, mother's assigned regional center counselor arrived at mother's address for a scheduled meeting, but was informed that mother no longer lived there. The regional center counselor told DCFS that mother should contact the regional center if she wanted services as they were going to deactivate her account.

On October 26, 2018, mother informed the DCFS social worker that she had rented a room, but would not provide her address.

The parents last visited Rose on October 11, 2018. The visit lasted three hours. Though mother called to confirm her October 24, 2018 visit, she did not appear. Mother did not appear for the October 25, 2018 visit.

At father's second scheduled visit, the parents arrived together and bickered during most of the visit. Father told mother that she slept a lot and that if he had not awakened her, she would not have visited the child. He also told mother that she did not know what she was doing, and he did not know how she was going to take care of the child.

When mother called Sandra and Jorge, she did not inquire about Rose. During visits, when prompted by Jorge, mother would change Rose's diaper and feed her. Jorge noted that

9

mother visited more frequently when court dates were approaching.

On October 9, 2018, DCFS filed a first-amended petition adding an allegation that mother and father had a history of engaging in violent altercations.

**Jurisdiction/disposition hearing**

The jurisdiction/disposition hearing took place on November 6, 2018. The juvenile court sustained the allegations set forth under section 300, subdivision (b)(1), regarding mother's inability to care for the child based on her cognitive disabilities. It also sustained count b-2, alleging that mother and father had a history of violent altercations. Rose was ordered removed from parental custody. The court ordered family reunification services for mother, including a 26-week developmentally appropriate parenting program, an assessment for a hands-on parenting class, individual counseling to address case issues such as parenting and child safety and protection, transportation assistance, and a regional center referral.

The court had previously granted mother six hours of visits per week, but because mother was not taking advantage of those hours, mother's monitored visits were reduced to three hours per week. The parents were not to visit together.

**Six-month review period**

Rose continued to thrive with Sandra and Jorge, who were meeting all of her needs. Mother was residing with father in a cluttered rented room in a two-bedroom apartment with another family. Mother was pregnant and due in August 2019.

In March 2019, father reported that mother slapped him during a November 2018 argument, however, the parents minimized the situation. DCFS assessed that mother became

10

frustrated easily due to her inability to express herself. Since mother wanted to move out of her room with father, her regional center worker was helping mother relocate to a supportive living residence, where staff would assist mother with tasks associated with independent living, such as cooking and cleaning. Parenting responsibilities however, would need to be assumed by mother. Mother and father intended to maintain their romantic relationship.

Mother enrolled in a hands-on parenting class and her attendance had been consistent. Mother had also scheduled her first therapy session.

Since November 2018, mother had been consistently visiting Rose. Mother had requested and was granted three additional hours of visits per week. Mother's visits were appropriate. She was able to change Rose's diaper, feed her, and noticed when Rose was crying. However, mother still sought the assistance of others when Rose cried, rather than attempting to find ways to soothe Rose on her own. Mother seemed unable to console Rose. Mother was also distracted during visits, speaking to the adult monitors and making unimportant phone calls to father.

On May 2, 2019, mother moved to an assisted living facility with a staff member, Glenda P. Glenda reported that mother was expected to clean up after herself, vacuum once a week, rinse her dishes, wash her clothes, follow the rules, and keep her room clean. Glenda was available to transport mother to appointments but mother would need to arrange for transportation for her personal matters. Glenda reported that mother would spend an excessive amount of time in her room and would benefit from activities outside the home. In June 2019, mother complained

11

that Glenda would not transport her places and that she felt picked on. Mother's parenting instructor explained that mother expected Glenda to provide a higher level of support, while Glenda expected mother to live more independently.

Mother and father maintained their relationship and spoke daily. On June 1, 2019, due to stomach pains, mother was transported to the hospital, where she tested positive for methamphetamine. Mother had been spending weekends with father at a motel, and DCFS opined that mother was engaging in unsafe activities with father while absent from the supportive living housing. Mother missed a mental health appointment, but claimed it was because she was not reminded by Glenda P.

Mother continued to visit with Rose, where she was directed by her parenting instructor. The social worker who observed a May 22, 2019 visit found that mother did not ask about medical updates or Rose's preferences. However, mother asked for guidance in feeding Rose and in her food preparation. Mother was easily distracted by other adults during the visit. Mother also required assistance in monitoring Rose, who moved around more quickly than mother. Mother informed the social worker that she was concerned about her ability to care for two children at the same time, prompting DCFS to be concerned that mother's cognitive delays would require her to have ongoing support in order to raise Rose.

In a June 2019 interview, father admitted being an alcoholic and that mother was a methamphetamine addict. He said that mother had asked if she could move back in with him once the new baby was born. He added that mother had lice, which he believed mother had passed on to Rose. In July 2019, the social worker observed that mother had head lice, and

mother's visits were suspended due to her failure to address the issue.

The six-month review hearing was held on July 9, 2019. The juvenile court found mother in partial compliance with her court-ordered case plan. The court ordered mother's reunification services continued for an additional six months. Mother was ordered to participate in weekly random drug testing. If any test was positive or missed, mother was to enroll in a full inpatient treatment program. Father was found to be noncompliant, and his family reunification services were terminated. The court warned mother to minimize contact with father because father was not engaging in services and the parents still engaged in conflict and disputes when they saw each other.

**Status review report**

In an August 2019 status review report, DCFS reported that Rose continued to thrive with Sandra and Jorge. Mother stated that she still spoke with father daily, and the two were still involved in a romantic relationship. Mother and father had spoken about meeting near her residence when the baby was born so he could visit with the child. Mother thought she and father were less hostile with each other when they spoke on the phone.

Mother's support team met and set new, very basic goals for mother, such as remembering to care for her hygiene, participating in outside activities, and gaining independent living skills. Mother still needed to be prompted to complete tasks such as laundry and cleaning her room, and to keep up to date with her medical appointments. Mother did not have interest in any hobbies or work outside of the home, and she worried about her

ability to care for both Rose and the new baby. She was unable to articulate a plan as to how she would care for both children.

Mother failed to participate in individual therapy. She missed an appointment on April 12, 2019, claiming it was because she was not reminded of the appointment. On July 15, 2019, mother stated that she did not believe she needed to participate in court-ordered therapy. She added that she would not be participating in any court-ordered services because she was too far along in her pregnancy.

Mother informed the social worker that she did not like the drug testing location, but when the social worker told mother that she could choose another site, further away, mother declined. The social worker reviewed the procedures for drug testing with mother. On July 24, 2019, mother texted the social worker and asked her to provide a new testing location. The social worker complied.

As of the status review report, mother still had lice. In a last-minute information for the court filed on August 28, 2019, DCFS reported that mother had been unable to participate in visits or parenting classes due to her lice. Mother gave birth to her baby, Kevin, in August 2019, while she still had lice. On August 17, 2019, mother was taken to a lice treatment center to remove the lice in one treatment.

Sandra visited mother in the hospital, where mother was argumentative with hospital staff. Sandra had to mediate several heated arguments. Sandra reported that the nurses were so put off by mother's behavior that mother was not receiving any assistance. The hospital provided mother with a voucher for a car seat, but would not help her obtain one. Mother argued with

14

Glenda P. because she would not bring mother a car seat. Ultimately, it was Sandra who obtained the car seat for mother.

Mother failed to be drug tested five times between July 19 and August 13, 2019. Mother tested negative for drugs on July 20 and August 17, 2019. Mother did not inform the social worker that she had delivered her baby, and missed her well baby check with the newborn.

**Twelve-month review**

The twelve-month review hearing was held on August 28, 2019. At the hearing, Rose's counsel joined with DCFS in asking that mother's reunification services be terminated. Mother's newborn baby had been detained from mother's custody. Rose's counsel argued that mother's regional center services were not adequate to help mother overcome her inability to care for Rose. Rose's counsel noted that mother had not been able to progress even in her new assisted living setting.

The juvenile court found mother to be in partial compliance with her case plan, ordered reunification services to be terminated, and set the matter for a permanency planning hearing pursuant to section 366.26. In making these findings, the juvenile court noted that the child came to the attention of DCFS because mother was not properly caring for the child. Mother did not properly care for her own hygiene, and was involved in an abusive relationship with father. The problems which existed at the commencement of the proceedings continued to exist.

**Permanency planning report**

In the December 11, 2019 section 366.26 report, DCFS reported that Rose remained with Sandra and Jorge, where she had been placed since July 5, 2018, when she was just six weeks

15

old.  Sandra and Jorge continued to meet all of Rose's needs, and Rose had a loving bond with them.  Rose was thriving in the placement, and Sandra and Jorge wished to adopt Rose. Sandra and Jorge had been approved as a resource family.  Sandra and Jorge were willing to remain in a relationship with mother and father if they adopted the child, but they did not want to enter an adoption contract.  Rose's younger sibling, Kevin, had also been placed with Sandra and Jorge.  Mother had informed the social worker that if she were unable to reunify with Rose, she wanted Sandra and Jorge to adopt Rose.  DCFS recommended that Rose be adopted by Sandra and Jorge.

Mother continued to visit with Rose.  However, it was noted that mother asked for guidance during the visits and was easily distracted by other adults.  Kevin would sometimes cry uncontrollably during mother's visits.  During one visit, Kevin was crying so much that mother and her parent coach decided to take him to the emergency room.  Jorge and Sandra were informed, and Sandra rushed to the hospital.  Kevin stopped crying when he heard Sandra's voice.  At that, mother became aggressive, yelled and screamed that she was Kevin's mother and could take care of her own son.  Kevin, in mother's arms, started crying again.  DCFS was concerned about mother's anger management issues as she was unable to control herself when arguing in the children's presence.

**Mother's section 388 petition**

On December 11, 2019, mother filed a section 388 petition requesting that the juvenile court reinstate family reunification services.  As to changed circumstances, mother asserted that she had completed a comprehensive parenting program and was continuing to address the issues that brought the matter to the

16

court's jurisdiction. Mother asserted that she continued to participate in individual counseling and that her therapist was willing to testify. Mother stated that the change of order would be in the best interests of the child because mother continued to establish a bond with Rose and it would be in Rose's best interest if they continued the relationship.

The juvenile court set a hearing on mother's section 388 petition for January 14, 2020.

DCFS filed an interim review report on January 7, 2020, in which it verified that mother completed her parenting course (she provided a certificate of completion). However, despite completing the course, mother continued to exhibit poor parenting skills. Mother had to be reminded of simple tasks such as feeding and changing the child. Though mother could follow step-by-step instructions, DCFS was concerned that mother had not demonstrated her ability to do these things on her own. Mother continued her inability to console her children. During one monitored visit, Rose accidentally dropped her cup on Kevin, who began to cry. Mother had to be prompted to pick up Kevin and had to be redirected from yelling at Rose. Rose was afraid and jumped into the social worker's lap for security. The social worker had to explain age appropriate guidance to mother. Mother wanted to put Rose in a time out, an approach mother learned in her parenting program, however, it was not age appropriate.

The social worker expressed concern that mother had extremely limited knowledge about caring for a toddler and was inconsistent with her own self-care. Mother was in need of a daily caregiver for herself, and needed to be instructed on daily life skills and functions. Mother failed to confirm a scheduled

weekly monitored visit due to mother's inability to prioritize her parenting responsibility. Mother did not confirm her scheduled visit on Halloween because mother was trick-or-treating by herself.

Mother was enrolled in a domestic violence batterer's program as well as individual counseling. However, mother had not completed the programs and was in only partial compliance despite having had ample time to complete them. Mother had not shown any progress in her ability to properly care for Rose. DCFS opined that it would be detrimental to reinstate reunification services, because such an order would prolong Rose's wait for the permanent plan of adoption. DCFS recommended that reunification services not be reinstated and that the child remain suitably placed with her caregivers.

The hearing on mother's section 388 petition was held on January 14, 2020. Glenda P. testified that her services included room and board, taking mother to doctor appointments, drug testing, and visits with Rose and Kevin. Mother could stay with Glenda indefinitely. Glenda was willing to help provide services to mother's children, though she had never monitored any of mother's visits with Rose. She had however, seen Rose three times when she dropped off mother for the visits. Glenda denied that mother used drugs in her home.

The social worker testified that mother was supposed to have visits with Rose on Wednesdays, and makeup visits on Fridays with Kevin. Mother's parenting coach attended the visits with mother, and provided assistance and redirection for mother. She would prompt mother to change the children's diapers and feed them. The social worker would monitor mother's visits when the parent coach needed a break. Mother generally had good

interactions with the children during visits, but mother would sometimes fall asleep during the visits.  Once mother left Rose unattended on the table while changing her diaper, requiring the social worker to step in and correct mother.  Mother responded that she was the mother and knew best.  The social worker noted that mother was not receptive to being redirected by DCFS because she did not trust DCFS.  The social worker also described the incident during which Rose accidentally dropped a cup on Kevin and mother got upset, yelled at Rose, and screamed so loudly that the parent coach, who was in the bathroom, ran back into the room.

The social worker said that often during visits the parent coach would have to take one of the children because mother could not handle both of them or soothe both of them.  The parent coach had to prompt mother to feed the children, including the amount of food to give them.  Mother did not provide snacks for the visits, instead Sandra and Jorge did.  Mother informed the social worker that she felt overwhelmed and did not think that the parent coach had provided her with enough help.

The social worker had not observed any changes in mother.  Mother continued to demonstrate issues of anger management, and mother's parenting instructor recommended another age-appropriate parenting class because mother was unable to retain the information taught in the class and apply it to her children.  Mother's counselor also recommended that mother take another parenting program.

Mother's and father's counsels argued that mother should be granted further reunification services.  Rose's counsel argued that mother's section 388 petition should be denied as mother had failed to demonstrate changed circumstances.  Mother had

19

not retained what she had learned in her parenting classes, and had not progressed beyond monitored visits with a parenting coach. Mother had been residing with Glenda P. for eight months, and the court had previously found that this change of residence had not improved mother's ability to parent Rose. Further, mother failed to show that such a change was in Rose's best interest because Rose was not bonded to mother and did not look to mother as a parent. DCFS joined Rose's counsel's position.

The juvenile court found that mother failed to meet her burden of showing changed circumstances. Despite completing a 10-week parenting course, mother continued to need parenting instruction because she did not retain the information that she learned. Mother needed constant instruction and redirection in order to be able to care for the children during visits. Mother's behaviors, such as falling asleep during visits and leaving Rose on the changing table, created a risk to Rose's safety and wellbeing. In addition, mother had failed to address her anger management problems.

The court also found that mother failed to show that it would be in Rose's best interest to make the requested change of order. Mother failed to show a parental bond with Rose.

The juvenile court denied mother's section 388 petition.

**Section 366.26 hearing**

The juvenile court found Rose was likely to be adopted, and that none of the statutory exceptions to adoption applied. The court terminated mother's parental rights and appointed Sandra and Jorge as Rose's prospective adoptive parents.

**Appeal**

On January 14, 2020, mother filed a notice of appeal.

## DISCUSSION

Mother argues that the juvenile court abused its discretion in denying her section 388 petition because mother demonstrated changed circumstances and it was in Rose's best interest to continue the positive interactions between mother and child.

## I. Applicable law

Section 388 provides, in part, that a parent "may, upon the grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of the court." (§ 388, subd. (a).) "The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstance or new evidence and that the modification would promote the child's best interests. [Citations.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685.) Section 388 permits a parent facing the loss of parental rights to seek additional reunification services "when a reformation has been completed in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) A parent petitioning the juvenile court under section 388 bears the burden of showing that both "a change of circumstances exists and that the proposed change is in the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

A ruling on a petition under section 388 is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Under this standard, a juvenile court's ruling will not be disturbed unless it is ""arbitrary, capricious, or patently absurd."" (*Ibid.*)

21

## II. The juvenile court did not abuse its discretion in determining that mother did not demonstrate changed circumstances

In denying mother's petition pursuant to section 388, the juvenile court focused on mother's failure to demonstrate changed circumstances. The court noted that mother had not even shown changing circumstances. In spite of completing parenting education, mother had not established that she could retain the information she learned in the class. Mother's ability to parent remained severely compromised in the absence of constant instruction and redirection.

Mother claims that her reasonable efforts to address the issues that led to the dependency should be considered a changed circumstance. Mother admits that her cognitive disability was not going to be resolved or cured. However, mother argues that she was not required to show that she was cured of the problems leading to the dependency -- only that she had addressed the concerns.

Mother provides no support for her position that unsuccessful efforts to address the problems leading to dependency constitute changed circumstances. *In re A.A.* (2012) 203 Cal.App.4th 597, 612 (*A.A.*), cited by mother, does not support her position. In *A.A.*, an incarcerated mother's completion of various services and programs in prison did not constitute changed circumstances sufficient to reverse the denial of a section 388 petition. The *A.A.* court noted that "[n]ot every change in circumstance can justify modification of a prior order. [Citation.]" (*Ibid.*) Instead, "the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citations.]" (*Ibid.*) Mother has not shown that the

22

problem leading to juvenile court jurisdiction over Rose was removed or ameliorated.

*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, also cited by mother, was an extraordinary writ proceeding involving the parents' challenge to a trial court order denying them reunification services pursuant to section 361.5, subdivision (b)(1) as to a child born during dependency proceedings involving an older child.[3]  In analyzing the language of that particular provision, the juvenile court determined that under that statute, "the '"reasonable effort to treat" standard . . . is not synonymous with "cure."  The mere fact that [mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it.'" (*Id.* at p. 97.)  Section 361.5, subdivision (b)(1) is not at issue in this case.  Instead, mother was required to show changed circumstances such that the problems leading to removal had been removed or ameliorated.  (*A.A., supra,* 203 Cal.App.4th at p. 612.)[4]

Mother argues that her living situation, with residential support to assist her in caring for Rose, constituted a changed circumstance.  However, mother had been living with the

_____

[3]     Section 361.5, subdivision (b)(10) provides that reunification services need not be provided to a parent if (1) the court ordered termination of reunification services for any siblings of the child due to a failure to reunify with that sibling; and (2) the parent did not subsequently make a reasonable effort to treat the problems that led to the removal of the sibling.

[4]     *K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, also cited by mother, also involved section 361.5, subdivision (b)(10), which is not relevant for the same reasons.

residential assistance of Glenda P. since May 2019, during her reunification period.  Mother and Glenda disagreed as to the level of care Glenda would provide.  While living with Glenda, mother continued to fail to meet very basic goals of cleanliness and independent living skills.  She did not maintain her hygiene, participate in outside activities, or gain independent living skills. While living with Glenda, mother had lice for over a month, even though the condition prevented her from visiting Rose.  Mother argues that by the time of the hearing on her section 388 petition, she had been living in residential assistance for seven months, and this stability in her living arrangement constituted a changed circumstance.  However, the juvenile court was not focused on the stability of mother's living situation, but on her ability to care for Rose.  The evidence supported the juvenile court's decision that mother's ability to care for Rose had not improved, in spite of her living arrangements.  Under the circumstances, the juvenile court did not abuse its discretion in determining that mother's living situation was not a changed circumstance under section 388.

Mother argues that her compliance with services showed she was open to direction and guidance.  Mother cites *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1215 for the proposition that the dependency statutes emphasize ""“preservation of the family whenever possible.”""  Mother further argues that dependency proceedings are not "simply a conveyor belt leading to the termination of parental rights." (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 676.)  While these propositions are generally true, they do not bring to light any abuse of discretion in the juvenile court's ruling on mother's section 388 petition.  The

24

juvenile court did not abuse its discretion in determining mother failed to show changed circumstances.

## III. Best interests of minor

Because mother failed to show changed circumstances, we need not address whether any change of order would be in the best interest of the child. However, we note that mother has also failed to show that her requested change of order would be in Rose's best interest. Mother faced a heavy burden in showing that it would be in Rose's best interest to reinstate reunification services. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' [Citation.]" (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) A parent and child share an interest in reunifying "up to the point at which reunification efforts cease. [Citation.]" (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) By the time a permanency planning hearing has been set, "the interests of the parent and the child diverge." This is true because the possibility of adoption "gives a child the best chance at a full emotional commitment from a responsible caretaker. [Citation.]" (*Ibid.*)

Mother's section 388 petition was filed on the eve of the permanency planning hearing. Rose had been in the care of Sandra and Jorge since she was six weeks old. By the time mother filed her section 388 petition in December 2019, Rose had been living with Sandra and Jorge for 17 months. Rose had a loving bond with her caretakers, and was thriving in their care. In contrast, mother had never moved beyond monitored visitation, with the instruction of a parenting coach. Mother's request for further reunification services conflicted with Rose's

need for permanence and stability. While mother claims that she had a positive relationship with Rose, this friendly relationship does not justify denying the child an adoptive home. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 465 [where foster family provided child with "all the day-to-day, hour-by-hour care needed by a helpless infant and then growing toddler," mother's bond with child insufficient to show change of order reinstating reunification services was in the best interest of the child under section 388].)

Mother again invokes the purposes of reunification services -- to maintain the familial bond. Mother cites *In re Kieshia E.* (1993) 6 Cal.4th 68, 76 for the proposition that maintenance of the family bond between children and parents comports with our highest values. However, mother cites no authority that maintaining the family bond should prevail where maintenance of that bond conflicts with the child's interest in a permanent, loving home.

The juvenile court did not abuse its discretion in determining that mother failed to show changed circumstances, or that her requested change of order was in Rose's best interest.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                                    CHAVEZ

We concur:

_____, Acting P. J.
ASHMANN-GERST
_____, J.
HOFFSTADT

26